

**PALADIN LAW, APC**

**BENJAMIN PAVONE, ESQ.**
STATE BAR NUMBER 181826
402 WEST BROADWAY, SUITE 400
SAN DIEGO, CALIFORNIA  92101
TELEPHONE: 619 224 8885
EMAIL: bpavone@cox.net

ATTORNEYS FOR PLAINTIFFS

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **STOP THE MADNESS,** a California Non-Profit Corporation; **CALIFORNIA SOLO AND SMALL-FIRM ATTORNEYS ("CASTLE")**, a California Non-Profit Corporation; **BENJAMIN PAVONE,**<br><br>   PLAINTIFFS,<br><br>v.<br><br>**STATE BAR OF CALIFORNIA; GEORGE CARDONA; LAURA ENDERTON-SPEED; ANDREW VASICEK; SAMUEL BECKERMAN; DATTARAY MAHUA; DEVIN URBANY; and Does 1-100,**<br><br>   DEFENDANTS. | **CASE NO. 25-11624**<br><br>**COMPLAINT FOR:**<br><br>I.   **EIGHTH AMENDMENT VIOLATION: EXCESSIVE FINES**<br><br>II.   **FIRST AMENDMENT VIOLATION**<br><br><br>**ACTION SEEKING STATEWIDE RELIEF (L.R. 83-11)** |

PALADIN LAW, APC
402 W. BROADWAY, STE. 400
SAN DIEGO, CALIFORNIA 92101

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................................3

JURISDICTION ...................................................................................................................3

PLAINTIFF PARTIES .........................................................................................................3

DEFENDANT PARTIES.......................................................................................................4

AGENCY/EMPLOYMENT .................................................................................................5

STATEMENT OF FACTS ....................................................................................................5

    A.   First Discipline Case: *Martinez* ............................................................................5

    B.   Second Discipline Case: *Willis* ...........................................................................9

    C.   Third Discipline Case: *Hyde* ..............................................................................16

I.    FIRST CLAIM FOR RELIEF .................................................................................22

II.    SECOND CLAIM FOR RELIEF ............................................................................27

    A.   <u>One</u>: Alleged "Harassment" of a Witness, Sandra Ledesma ...........................27

    B.   <u>Two</u>: Metaphorical Reference to "Testicular Integrity" is Free Speech..........29

    C.   <u>Three</u>: Sanctions Should Never Have Been Imposed for Pavone's of a Motion for Reconsideration after a Plainly Inaccurate Ruling on an Anti-SLAPP Motion......................................................................................30

    D.   <u>Four</u>: the Motion for Reconsideration Was Not Legally Frivolous, as Undersigned Counsel Was Permitted to Examine an Issue that Was First Raised in the Ruling Itself, the Question of Speculation, and Examined it by Reference to New Evidence and New Authority...................34

    E.   <u>Five</u>: Counsel Paid the Sanctions .......................................................................36

    F.   <u>Six</u>: The San Diego Court's Subsequent $17K Sanction Fine Reflects a Grotesque Abuse of Power.  Counsel Filed a Perfectly Legitimate, Accurate, Amply Supported, Middle-of-the-Road Motion to Cite Attorney Bailey for Ethical Misconduct under CPRC 4.1 and 8.4 ..................37

PRAYER FOR RELIEF ......................................................................................................38

REQUEST FOR TRIAL BY JURY......................................................................................39

PALADIN LAW, APC
402 W. BROADWAY, STE. 400
SAN DIEGO, CALIFORNIA 92101

## INTRODUCTION

1.      Plaintiffs seek to end the State Bar's excessive fine system.

## JURISDICTION

2.      The California Central District Court has jurisdiction over this action pursuant 28 U.S.C. §§ 1331 and 1343 because this action involves the infringement on Plaintiffs' federal constitutional rights and the State Bar of California's Los Angeles office sits within its jurisdictional perimeter.

3.      Title 42 United States Code section 1983 provides that every person who, under color of law, causes another to be deprived of any of their constitution rights or protections under federal law, shall be liable to the plaintiff in an action for damages, for injunctive relief, or for any appropriate relief able to be pursued by law.

4.      Other defendants are believed to be located in this district and substantial activity related to the gravamen expressed in this case has occurred in this jurisdiction. Accordingly, this is a proper venue pursuant to 28 U.S.C. § 1391(b).

## PLAINTIFF PARTIES

5.      **Plaintiff One, Stop the Madness**: Plaintiff "Stop the Madness" is a presently unincorporated entity, pending certification by the California Secretary of State as a California non-profit corporation, formed for the purpose of advocacy related to the State Bar of California.

6.      **Plaintiff Two, Castle**: Plaintiff "California Solo and Small-Firm Lawyers" (aka "Castle") is a California non-profit corporation, formed in 2022, dedicated to advocating for the interests of solo and small-firm attorneys, especially in terms of their treatment by the State Bar of California.

7.      **Plaintiff Three, Benjamin Pavone:**  Plaintiff Attorney Benjamin Laurence Pavone (Pavone, Plaintiff, undersigned counsel, counsel, Plaintiff Three, or narrated in the first person) is a 30-year civil litigation and trial attorney, focused on civil rights class actions, and has practiced law exclusively as a licensed California attorney.

PALADIN LAW, APC
402 W. BROADWAY, STE. 400
SAN DIEGO, CALIFORNIA 92101

**DEFENDANT PARTIES**

8.      **Defendant One, California State Bar**.  The California State Bar is an organization created by the California Legislature by the 1927 State Bar Act and functions as an administrative division of the Supreme Court of California.  It licenses attorneys and regulates the practice of law in California.  It is responsible for managing the admission of lawyers to the practice of law, investigating complaints of professional misconduct, discipline, and other functions.

9.      The following individual defendants are agents of the State Bar of California that lead or operate its discipline system.  They impose this system on attorneys in California on a daily basis, including in multiple examples on Plaintiff Pavone.

10.      **Defendant Two, George Cardona.**  Defendant George Cardona is the head of the Office of Chief Trial Counsel and is therefore responsible for the prosecutorial side of the discipline system, including its policies, procedures, and top-level case decisions.  Mr. Cardona appears on every pleading filed in State Bar Court.  He is therefore responsible for the legality and appropriateness of every case the agency brings.

11.      **Defendant Three, Laura Enderton-Speed**.  Defendant Laura Enderton-Speed is the current president of the State Bar of California and is therefore responsible for its positions, policies, and procedures, including those of the discipline system.

12.      **Defendant Four, Andrew Vasicek**.  Defendant Andrew Vasicek is a State Bar prosecutor who has continuously prosecuted Attorney Pavone since 2021, including to charge him with 2,017 ethical violations in 2023.

13.      **Defendant Five, Samuel Beckerman**.  Defendant Samuel Beckerman is a State Bar prosecutor who joined in the prosecution of the 2,017-charge indictment of Attorney Pavone, with Defendant Vasicek.

14.      **Defendant Six, Dattaray Mahua**.  On information and belief, Defendant Dattaray Mahua is the State Bar prosecutor in charge of, or associated with, the current

PALADIN LAW, APC
402 W. BROADWAY, STE. 400
SAN DIEGO, CALIFORNIA 92101

discipline investigation in a civil case Pavone handled from 2021-2024, *Hyde v. McDermott*.

15.    **Defendant Seven**, **Devin Urbany**.  Defendant Devin Urbany is the current non-attorney State Bar investigator assigned to the *Hyde* investigation.

## AGENCY/EMPLOYMENT

16.    Plaintiff is informed and believes, and thereon alleges, that each of the defendants, including the 100 fictitiously-named defendants, is responsible in some manner for the claims and obligations sued upon herein.

17.    Plaintiff is informed and believes, and thereon alleges, that at all relevant times, unless specifically otherwise alleged, each of the defendants was the agent, servant, and employee of the State Bar of California, each of the remaining defendants and was at all relevant times acting within the course and scope of his authority as agent, servant, and/or employee and with the permission/consent of the remaining defendants.

## STATEMENT OF FACTS

18.    Attorney Pavone is a 30th-year civil litigation and trial attorney, out of Cornell and UCLA, with a current emphasis on civil rights class actions.  Counsel has litigated approximately 500 cases of every type and variety, is a member of every federal court in California, has filed in the United States Supreme Court, and has litigated cases around the country.

19.    Given this diverse civil litigation background, counsel operates as a complex litigation attorney as counsel routinely handles matters that involve the core civil dispute, as well as managing virtually all collateral aspects of the case, such as if the dispute spills over into other forums, including into appellate forums, family, probate, criminal, or other locales.  In having spent now six years being continuously prosecuted by the State Bar, counsel has also become, by necessity, an ethics and discipline expert.

**A.    First Discipline Case: *Martinez.***

20.    Attorney Pavone was prosecuted by the State Bar of California for four years beginning in 2019, requiring about one million dollars of attorney time to defend,

PALADIN LAW, APC
402 W. BROADWAY, STE. 400
SAN DIEGO, CALIFORNIA 92101

because he made a single, allegedly sexist comment in a 2017 notice of appeal and tendered a legal argument across several appellate briefs.

21.    The legal argument essentially asserted intellectual dishonesty by an Orange County trial judge, Carmen Luege, in a post-trial fee ruling, by asserting that she ruled inaccurately across every single issue, knowing these rulings were inaccurate, as retribution for counsel's detection that one of her colleagues was incompetent, in the medical sense.[1]

22.    Judge Luege had paid counsel nothing on a $150K fee application and admitted that it was the first time in her career in handling dozens, if not hundreds of fee applications, that she paid the moving lawyer, undersigned counsel, absolutely nothing. She later provided an interesting volume of implausible and irreconcilable testimony in trying to defend her decisions on the stand.

23.    Pavone was ultimately exonerated of the allegedly sexist comment, as it was found to be constitutionally protected under the First Amendment's rhetorical hyperbole doctrine.  In layman's terms, this means it was a joke that no normal person could take as a serious factual accusation.  (The joke was that the trial court's ruling was a "succubistic adoption of the defense position," thus implying, in the Orange County judiciary's view, that that the trial judge was, factually, the human incarnation of a demon spirit.  Such mythical references originated in ancient Jewish folklore in the "Legend of Lilith," most frequently mentioned in the Babylonian Talmud.)[2]

24.    The comment was buried at the bottom of a Notice of Appeal and was unnoticed by anyone for almost two years.  However, an Orange County appellate justice,

[1]  This judge was unquestionably displaying symptom of incompetence and he retired not long after.  Out of respect for his long history as a good judge, counsel has not identified him here.

[2]  However, counsel was not a Talmudic scholar.  Rather, he was a Dungeons and Dragons master in the early 1980's, in his early teens, and had encountered succubi playing as his D&D character, a 27th-level paladin.  Thus, it was nothing more than a creative writing barb, a quip, one she didn't even see, after the judge ruined four years of work counsel had performed to win the *Martinez* trial.

PALADIN LAW, APC
402 W. BROADWAY, STE. 400
SAN DIEGO, CALIFORNIA 92101

Richard Fybel, whose piety apparently compelled him to interpret the joke literally, published an opinion lambasting counsel as invoking demonic incantations against Judge Luege. This inspired the local trade media to conduct a kind of #metoo pile on, as it was fashionable at the time, in 2019, to attack men based on any conceivable basis for gender criticism, no matter how untethered from reality that criticism was.[3]

25. By recommending prosecution, Justice Fybel committed the tort of "successful retaliatory inducement to prosecute," an abuse of power, when he advocated for Pavone to be prosecuted in violation of counsel's First Amendment constitutional rights.[4]

26. Regardless of that issue, Pavone was found culpable for a second charge, relating to assertions of intellectual dishonesty, because the State Bar judiciary refused to face the fact – *that is*, the truth – that these arguments were also constitutionally protected, by the First Amendment doctrine of disclosure.[5]

27. This doctrine holds that if a lawyer, or anyone, labels another in generalized opinion terms, such as criticizing a judge of engaging in "intellectual dishonesty," the accusation is protected from consequences by the First Amendment if the facts supporting that label are disclosed to the reader.[6] The idea is that disclosure of

---

[3] *Martinez v. O'Hara* (2019) 32 Cal.App.5th 853, 856; *see e.g.*, Rubino, Kathyrn, "*Attorney in Hot Water after Referring to a Judge as a Succubus*," Above the Law, online: https://tinyurl.com/4yep4knp.

[4] *Pavone v. Fybel* (C.D. Cal. 2021) No. 2:21-cv-01778, Dkt. 1; *see Hartman v. Moore* (2006) 547 U.S. 250, 256, 262; *Nieves v. Bartlett* (2019) 587 U.S. 391, 396-397.

[5] *Yagman v. Standing Committee* (9th Cir. 1995) 55 F.3d 1430, 1438-1441.

[6] *See Phantom Touring v. Affiliated Publications* (9th Cir. 1992) 953 F.2d 724, 730. Notably, lawyers and judges routinely label attorneys as intellectually dishonest, but the judiciary uses a different word: disingenuous. As the two terms mean the same thing, and the standards of conduct for each are comparable, it would be an apparent equal protection violation for judges to be permitted to accuse attorneys of intellectual dishonesty (by using the term disingenuous) but not permissible for attorneys to label judges of doing the same thing. In fact, as judicial honesty is an apex obligation for members of the judiciary (*see, e.g., Inquiry Concerning Ross* (2005) 49 Cal.4th 8 CJP Supp. 79, 89, *citing Kloepfer v. Commission on Judicial*

PALADIN LAW, APC
402 W. BROADWAY, STE. 400
SAN DIEGO, CALIFORNIA 92101

the underlying facts allows the reader to draw his or her own conclusion, such that the label assigned by the lawyer is effectively irrelevant.[7]

28.     By the end of the litigation, the State Bar prosecutors seemed to accept this reality, because they did not oppose counsel's First Amendment disclosure argument in the appellate briefs.

29.     Nevertheless, the State Bar judiciary refused to accept this stipulated constitutional reality.  The State Bar Court Review Department, quite incredibly, simply pretended Pavone's First Amendment disclosure argument did not exist, despite counsel raising it dozens of times during the case, including in pre-trial motions, at trial, in interlocutory petitions, and of course, in the appellate briefing.

30.     The Review Department nevertheless found counsel culpable of B&P 6068(b) disrespect of a judge.  It then subjected Pavone to a litany of draining and expensive consequences, including the imposition of over $27,000 in fines.

31.     In one of the most profound displays of institutional hypocrisy in California legal history, while the State Bar was fully engaged in lording its ethical superiority over attorneys like Pavone, for a linguistic kerfuffle related to a mythical creature, it was ignoring 30 years of felony crime, involving millions of dollars of stolen client settlements, by Attorney Tom Girardi.

32.     Girardi had infiltrated the State Bar and effectively insulated himself from the risk of any disciplinary action, by seducing OCTC with fancy parties and his celebrity status, while employing State Bar employees, including a State Bar judge, Richard Platel, to run interference for him and thereby further disguise his crime spree.[8]

---

*Performance* (1989) 49 Cal.3d 826, 865), attorneys must be given latitude to establish such facts for the protection of the public. (*See In re Mallery* (2024) 15 Cal. 5th CJP Supp. 1, 84 ["The commission has stated that foremost in its consideration of factors relevant to discipline is honesty and integrity. [Cite.] Honesty is a minimum qualification expected of every judge…"]

[7]  *Yagman v. Standing Committee* (9th Cir. 1995) 55 F.3d 1430, 1439.

[8]  Exhibit 4.

PALADIN LAW, APC
402 W. BROADWAY, STE. 400
SAN DIEGO, CALIFORNIA 92101

**B. Second Discipline Case: *Willis.***

33.     In 2015, Pavone accepted a kidnapping/probate case, in which a severely incompetent elder, Teresa McClain, had been surreptitiously taken from her home in San Diego to the outskirts of Indiana, by a team of neighbors, probate lawyers, and one estranged relative of the elder, Teresa's long-list sister, who lived in Indiana.[9]

34.     Teresa was clearly incompetent as reflected by an overwhelming amount of evidence, beginning in September 2014 and continuing throughout her passing in June 2016:

(1)     In Fall 2014, a friend of Teresa for 45 years, Sandra Brenner, notices that Teresa has suffered a significant loss of mental acuity, in that she has difficulty remembering people's names and she cannot complete her thoughts;

(2)     At the time, Teresa suffers major memory and functional loss, in terms of asking Sandra rudimentary questions, such as "if I want to go buy a pair of shoes, how would I do that?"

(3)     Teresa's grandson, Travis LeMay, observes that Teresa is anxious, paranoid, and needs to be reminded to eat, to the point of treating her like a child in terms of cutting fruit for her, and providing Ensure, to keep up her nutrient intake, as well as needing to remind her to shower;

(4)     Having spent time with her in this window, Travis concludes that that she either needed to be placed in a nursing home or placed under the care of a full-time nurse;

(5)     Teresa expresses paranoia to LeMay, and to Brenner, that someone is stealing her money;

(6)     Both Travis and Brenner take Teresa to her bank for the purpose for policing these fears, only to be reassured by the bank that nothing is amiss;

(7)     During their respective trips with her, they learn that she has been making regular trips to the bank expressing these fears, but she would forget she made the trip the day before, the fear would resurface again, and she would make another trip;

(8)     Brenner is particularly rattled by this dynamic, because Teresa was formerly a bank teller. This area of intellectual discipline should have come most easily to her, which suggests that if she was unable

---

[9]     Exhibit 7.

to perform tasks within her most developed skill set, other tasks were probably even more impossible for her;

(9) Still in 2014, Teresa engages in the same pattern of making repeat approaches to her estate attorney, Krista Dupps, in seeking to change her estate plan – to the state that it already existed;

(10) Due to the repeat behavior, Dupps concludes that Teresa is no longer competent to make decisions about her estate plan and recommends to the Willis family that they obtain doctor's orders to remove Teresa from control of her estate instruments;

(11) Teresa becomes unable to unable to cook for herself as she is unable to remember how to use a stove or oven;

(12) Billena concludes that she needs 24/7 parental supervision, in order for Teresa to conduct her daily life, by Billena escorting Teresa to make her daily trips and errands;

(13) Because Teresa could not manage the scheduling ability to regularly attend church, even though it was an important activity to her, Billena supervised her to make sure she attended church;

(14) Billena also needed to encourage Teresa to go outside, and would escort her to take walks and go to the beach, against Teresa's increasing tendency to just sit at home;

(15) Myzsa interviews Teresa for a school project and Teresa is unable to name her father or identify where she is from;

(16) From 2014 onward, she could not recognize or correctly identify friends and family members and she called everyone Billena;

(17) she was at times not oriented to her place or circumstances and she suffered from dementia;

(18) she was vulnerable to persuasion of virtually any sort or kind;

(19) in January 2015, the Montreal cognitive exam was too difficult for her to complete, much less pass;

(20) she had to be routinely reminded to shower, change clothes, brush her teeth and hair, and eat, was unable to run errands, grocery shop, cook, or drive by herself;

(21) she could not manage her finances including to pay her bills; when she would try, she would become frustrated because the task was too difficult for her;

(22) she would repeat and cycle the same conversations, reflecting severe short-term memory loss, unable to remember what happened the previous day(s) (which would disable anyone's ability to make decisions involving any complexity);

(23) in early 2015, her bank concluded she was not competent to manage her accounts;

(24) she could easily be manipulated, including to sign documents, including legal documents, without knowing what they were or what they would accomplish;

(25) she could not perform simple intellectual functions: she no longer understood how to play checkers; she forgot how to buckle a seat belt;

(26) she was in denial about the state of her declining faculties and inability to care for herself;

(27) in early 2015, she was unable to recall three words in a row, count down from 100, or spell the word "world" backwards;

(28) in January 2015, two physicians diagnosed Teresa as unable to manage her finances;

(29) in January 2015, six months before the probate dispute arose, Teresa was replaced as trustee by Billena, based on Teresa's lack of competence;

(30) also in January 2015, Teresa was diagnosed as suffering from dementia and memory loss;

(31) by June 2015, Teresa was so confused that she believed she was changing residences to reside with Billena, but she did not know where that was. At the time, Teresa lived with Billena at the Oliver residence, but was staying at a neighbor's house;

(32) In the same conversation, Teresa reported that she was moving in with McCall. Neither possibility was true, as she was moved on August 7, 2015 to Indiana by her probate kidnappers and would be cut off from the Willis family for seven months – while Billena was dying.

(33) In September 2015, Teresa made multiple attempts to "escape" Carson's residence, prompting Carson to put her in a nursing home, Kearns Comfort, for her safety.

(34) On September 14, 2015, Attorney Stoffel arranged for Teresa's competency to be formally evaluated by a physician, Dr. John Chase. Stoffel claimed to Chase that "[p]rior to this family dispute, Teresa was driving, handling her own finances, and maintaining her own household" – none of which was remotely true.

(35) On September 25, 2015, Dr. Chase prepared a report documenting that Teresa could not perform basic tasks, including driving, paying bills, self-care, or cooking.

(36) Chase also tested Teresa. She scored 2/30 on the Montreal cognitive assessment [exam]. The 2/30 MOCA score reflects

PALADIN LAW, APC
402 W. BROADWAY, STE. 400
SAN DIEGO, CALIFORNIA 92101

severe cognitive impairment; Chase declared her incompetent to make any serious decision.[10]

(37) She was completely disoriented during the examination and identified the month as "34."

(38) She identified her location as San Diego, although she was in Indiana.

(39) She was unable to perform trail making, copy a cube or draw clock face. She was unable to register 5 words initially and recall after distraction was 0/5. She was inattentive and distractable.

(40) In November 12, 2015, Teresa was deposed and it was obvious that she was incompetent, as she displayed a long list of serious cognitive deficits;

(25) In January 2016, Teresa was interviewed by an appointed conservatorship lawyer, Phillip Lindsley, an expert in elder law; he also found her to be severely incompetent.[11]

35. This above-referenced motley crew of probate insiders, neighbors, and Carson – since when do neighbors get embroiled in other people's probate estates – were clearly conspiring to attack McClain's portfolio of $2M in virtually unencumbered real estate.[12]

36. Teresa was their hostage. Her $2M estate was the solution to their financial problems. Her immediate family, the Willis family, who had lived with Teresa in San Diego, her home of 50 years, and had taken care of her since 2012, and were her designated heirs, hired counsel to liberate her from her Indiana captors and protect the estate.

37. Pavone successfully did so, in that, on an emergency basis over the course of a nine-month sprint of litigation, counsel recovered $1.4M of the estate for the family, kept the thieving neighbors and professionals to just $300K, and recovered the elder herself, from Indiana.

38. This was despite a concerted, coordinated resistance effort by the kidnappers, who pretended she was competent and sought to hold her in Indiana, to drain

---

[10] Exhibit 2:3.
[11] Exhibit 8.
[12] Exhibit 7.

PALADIN LAW, APC
402 W. BROADWAY, STE. 400
SAN DIEGO, CALIFORNIA 92101

her estate for their benefit. As long as they had physical control over her person, they were able to extract money out of her estate.

39. Pavone's effort to liberate McClain required a complex litigation effort against the kidnappers, and the probate system themselves in two states, for both refused to face the reality that they did not have authority to invade her estate, or spread out money to insiders, since she was incompetent.

40. If she was incompetent – and she was unquestionably so, having scored 2/30 on the MOCA competency test among many other indicia as detailed above – her estate plan dictated that her granddaughter, Myzsa Willis, would be empowered to make all decisions for her.

41. Thus, the California probate court had no authority to seize control of Teresa's estate, and if it had recognized this reality upon Pavone's early legal requests and detailed submissions, the kidnappers would never have had any basis to claim Teresa was a resident of Indiana, in order to initiate a second legal action and cause the Willis family's bill to roughly double.

42. But the California probate system simply pretended otherwise and tactically delayed a critical competency ruling for five months – long enough for the kidnappers to claim she was an Indiana resident and start a whole new case there.

43. This seemed to be part of a standard playbook in probate, in that the probate judge, Julia Kelety, received a stunning number of reports on a feedback website that indicated that she favored probate insiders at the expense of the heirs.[13]

44. Justice Kelety refused to face the fact that she did not possess jurisdiction over an incompetent person, despite Pavone's meticulous submissions, evidence, and motions establishing this. Indeed, to this day, the California legal system incredibly maintains that competency is not even a requirement in trust actions (the vehicle utilized to invade McClain's estate), in brazen derogation of Probate Code section 17004.

---

[13]   Exhibit 3.

PALADIN LAW, APC
402 W. BROADWAY, STE. 400
SAN DIEGO, CALIFORNIA 92101

45.    The kidnappers had secretly tested Teresa in September 2015, just a month after the first probate filing, and privately learned that she was severely incompetent.[14] However, they did not report the findings to the court.  Attorney James Stoffel buried it.  Instead, three days later, they moved to immediately seize control of the estate, aware that revelation of this competency report would end their ability to invade it.

46.    Based on the report, Teresa was thus utterly incapable of making any serious decision, so Pavone had to battle probate insiders, and the system itself, in both states to return her to her family.

47.    Because McClain was being held hostage and the San Diego court would not promptly liberate her, Pavone sought emergency relief from other courts, including a San Diego appellate court and a San Diego federal district court, by advocating for them to face the reality of McClain's incompetence that the San Diego probate system would not.  But they too refused to face McClain's incompetence.

48.    The legal effort also included a trial in Indiana, in which counsel, in another emergency exercise initiated by the kidnappers, tried a case in which they sought to retain control over Teresa and thus retain power to continue attacking her estate.

49.    Because of these various lawsuits, counsel's bill ballooned to $650K.  The bill would have only been $100K if the San Diego court had promptly faced Teresa's incompetency, but it, and all subsequent courts, absolutely refused to face the most basic fact about the case – that Teresa was severely incompetent – and they continue to refuse to face it, even to this day.

50.    This is perhaps because a formal recognition that McClain was never competent would have had calamitous legal consequences for the probate system and its insiders.  The insiders would be formally deemed kidnappers and elder abusers and the San Diego probate system would be seen as facilitating it.  They all would be seen as predators of Teresa McClain, not protectors.

---

[14]    Exhibit 2:3.

PALADIN LAW, APC
402 W. BROADWAY, STE. 400
SAN DIEGO, CALIFORNIA 92101

51.     In 2023, the State Bar got involved, continuing the cover-up on behalf of the probate system and its insiders.  OCTC charged Pavone with 2,017 ethics offenses. This is 13 times more charges than the next highest number of charges in State Bar legal history.[15]

52.     The 2,017-charge NDC in Pavone's *Willis* discipline action exists as the most abusive charging document in American legal history.  Taking as self-evident that such an instrument is improper, the State Bar committed over 435,000 ethical violations by virtue of its filing, especially since its entire case was anchored on the massive lie that Teresa McClain was competent.[16]

53.     The NDC employs an unprecedented combination formula of phrases and clauses to mix, match, and multiply accusations.[17]  To counsel's knowledge, no charging document in legal history – criminal, quasi-criminal, discipline, administrative, or otherwise – has ever been structured this way, and when its combination formula is fully written out, accusation by accusation, it results in a 405-page, single-spaced charging document, with over 2,000 distinct accusations.[18]

54.     In what is a positively surreal refusal to face this massive prosecutorial abuse, both the State Bar Hearing Department and the Review Department cannot even bring themselves to discuss this reality and they both simply pretend that this fact does not justify automatic dismissal of the action, for egregious prosecutorial misconduct.

55.     By pretending that the charging document was anything but what it was, the State Bar and its Court then jammed counsel into trying this impossible NDC just five months later, and convicted him across the board, of various "ethics" offenses.

---

[15]   Exhibits 6, 9; *compare In re Hindin* (Review Dept. 1997) 3 Cal. State Bar Ct. Rptr. 657 [involving 150 accusations].
[16]   Exhibit 11
[17]   Exhibit 6.
[18]   Exhibit 9.

PALADIN LAW, APC
402 W. BROADWAY, STE. 400
SAN DIEGO, CALIFORNIA 92101

PALADIN LAW, APC
402 W. BROADWAY, STE. 400
SAN DIEGO, CALIFORNIA 92101

56.     Refusing to face the truth about McClain's obvious incompetence, and the sprawling legal consequences that would attach if it were to formalize that truth, the State Bar has now recommended undersigned counsel's suspension from practicing law.

57.     In other words, the California legal system, including its State Bar, is essentially scapegoating undersigned counsel to protect the insiders and the probate system from the massive consequences of their torts, namely, that since McClain was incompetent, their efforts to surreptitiously transport her to Indiana, loot her estate, and hold her there constituted kidnapping and elder abuse.

58.     In the *Willis* discipline case, the State Bar has also fined undersigned counsel over $27,000, with makes the total as of this writing over $54,000 in fines imposed on undersigned counsel for the *Martinez* and *Willis* matters.

**C.  Third Discipline Case: *Hyde*.**

59.     Because of counsel's efforts that tended to expose the San Diego probate system as lawless, and possibly corrupt,[19] Pavone became a target among its local judiciary.

60.     In 2021, counsel filed the *Hyde* case, a plaintiff personal injury action with a sexual misconduct component.  Factually, in June 2020, David Hyde worked as a delivery driver for a La Mesa marijuana dispensary named "The Grove."  It was led by a businessman named Sean McDermott.  For reasons that are unclear, McDermott came to hate Hyde.

61.     Apparently not content to just fire David, McDermott, at the 2020 height of the #metoo movement, decided to both fire him and recruit two employees (one current, Sandra Ledesma, and one former, Tiana Mesta, respectively) to falsely accuse David of sexual misconduct, in order for David to be perceived as a #metoo style serial

---

[19]   Part of the explanation for the probate judge's refusal to face McClain's incompetence is chronicled in judicial feedback reports about her, which disturbingly reflect the same criticism over and over: that she favors probate insiders. (Exhibit 3.)

sexual offender, and thus become one of the many men at the time whose reputations were being destroyed by such accusations.

62.    When McDermott fired David, he, McDermott, also physically attacked David, in a brief but vicious moment caught on video, one in which McDermott attacks his own employee from behind.

63.    Pavone initially filed suit on behalf of David for the physical attack, initially unaware of McDermott's false-accusation scheme.  David quickly and vehemently denied any sexual misconduct, but at the time, many such accusations were being corroborated by the legitimate tactic of assembling multiple accusers to smooth over the potential credibility problems with any one accuser.

64.    After much work to prove that the scheme had been fabricated by McDermott – careful analysis revealing that Ledesma perjured her way through her deposition (prompted by McDermott who had bribed her with free representation by an attorney named Harvey Berger, if she would testify falsely that David touched her inappropriately) and deposition testimony by Tiana Mesta, who testified that McDermot tried to bribe her to implicate David as a sexual molester – Pavone amended the complaint to sue McDermott and The Grove for both the physical assault and for sexual harassment.

65.    Basically, McDermott tried to frame David for serial sexual misconduct by recruiting young women to fabricate false sexual molestation accusations and thereby create a #metoo offender out of him.

66.    Based on these events, it became apparent that McDermott was using attorneys, namely his defense attorney Micah Bailey and the attorney he bribed Ledesma with (Attorney Harvey Berger), to perpetrate this false-sexual-misconduct scheme.

67.    But once again, a lawless San Diego judiciary came to the rescue of insider misconduct.  McDermott's favored local defense attorneys, Berger and Bailey, exonerated McDermott from his sexual-misconduct scheme, despite a massive body of evidence Pavone had developed establishing it.

PALADIN LAW, APC
402 W. BROADWAY, STE. 400
SAN DIEGO, CALIFORNIA 92101

68. Attorney Pavone spent two years of meticulous discovery work to develop a body of evidence proving the scheme: deposition testimony, police reports, Axon police videos, and various other standard items of evidence (*e.g.*, letters, text messages, emails, *etc.*), including evidence of a polygraph test that David passed and Ledesma refused to take.

69. The body of information constituted a solid evidentiary proof, one that had been carefully and meticulously assembled, to establish how McDermott recruited Ledesma and Mesta to perjure false-sexual-assault stories and used his complicit attorneys to sell the false narrative.

70. However, the scheme fell apart when Tiana Mesta balked at falsely accusing David of sexual misconduct at her deposition, and instead, under oath, revealed that McDermott had bribed her and that David had never done anything inappropriate toward her.

71. Yet, the San Diego trial judge ruled that this massive body of compelling evidence was "unsupported speculation." The court thereby found that McDermott's felonious abuse-of-women conduct was constitutionally protected. This one lynchpin ruling subjected David to fees imposed by the anti-SLAPP laws and thereby neutered his case.

72. At trial, still able to at least theoretically prove McDermott's physical attack, armed with evidence of McDermott's #metoo scheme as relevant to it – the attack started by virtue of David immediately exiting the termination interview upon Sean's sexual misconduct accusation – the San Diego judge conveniently excluded Ledesma and Mesta from testifying, at all.

73. The judge similarly precluded Pavone from asking questions to McDermott about the same subject – another installment of lawlessness, apparent corruption, and certainly gross inaccuracy by the San Diego judiciary.

74. Consequently, with David's case defanged by the anti-SLAPP ruling and with Plaintiff Hyde barred from discussing the most potent and centrally relevant

PALADIN LAW, APC
402 W. BROADWAY, STE. 400
SAN DIEGO, CALIFORNIA 92101

evidence in the case at trial, David lost the case, was awarded nothing, and now owes McDermott over $40,000 in anti-SLAPP fees and additional costs.

75.    Worse, the San Diego court went on a sanction spree against Pavone, by imposing over $23,000 in sanction fines – more than the combined total of all sanctions issued against Pavone over the course of his entire 30-year legal career.

76.    Apparently still not content, the San Diego court also referred Pavone to the State Bar, evidently to be prosecuted by OCTC for a third time, as a way to neutralize counsel from protesting the Court's own lawlessness and complicity in whitewashing McDermott's abuse-of-women scheme.

77.    The problem, however, is that the grounds to ethically prosecute undersigned counsel in *Hyde* are especially weak, to the point, frankly, of being stupid. The $23,000 in sanctions orders against Pavone rest on untenable grounds and are much closer to proving overreach, corruption, and lawlessness by the San Diego judiciary than they are at proving ethical misconduct by Pavone.

78.    Instead, in what appears to be a local legal system now (or maybe it always was)[20] deeply infected with favoritism, tribalism, and factionalism, the subject judges violated the law and then imposed sanctions to punish the disfavored lawyer for the benefit of favored ones.

79.    The main *Hyde* ruling, during the anti-SLAPP portion of the case, borders on absurdity. Characterizing the body of evidence of McDermott's #metoo abuse-of-women scheme as "unsupported speculation" is sort of like characterizing the evidence of O.J. Simpson's guilt as "wishful thinking."

80.    If there is ethical misconduct in the *Hyde* case, it was clearly committed by Attorneys Bailey and Berger, not Pavone. In fact, Pavone chronicled hundreds of ethics offenses committed by Bailey and Berger, for their execution of McDermott's abuse-of-women perjury scheme.[21]

---

[20]    *United States v. Frega* (9th Cir. 1999) 179 F.3d 793, 798.
[21]    Exhibit 17-18.

81.     Sandra Ledesma, who committed perjury about 50 times at her deposition by attesting to two acts of harassment that never occurred, reveal McDermott, Berger and Bailey working together to create the illusion of multiple false accusations of sexual misconduct against David – all of it a fabrication by Ledesma and McDermott.[22]

82.     In addition, Attorneys Berger and Bailey also each committed a block of billing misconduct, as each tried to illegally maximize the sanctions awards against undersigned counsel.

83.     Attorney Berger committed an additional 177 ethical violations, strictly relating to billing, in his attempt to stretch one recoverable billable hour into a $7,000 sanction bonanza, at Attorney Pavone's expense.[23]

84.     Attorney Bailey committed several dozen additional ethical violations when he tried to defend an utterly implausible fee demand he had made, to the effect that Attorney Pavone owed him $13,565.[24]   Bailey refused to turn over his billing records to support this claim, since such disclosure would provide documentary proof of his ethical misconduct in making the demand.

85.     As it stands, the State Bar has not initiated a prosecution of Pavone for the *Hyde* case, yet.

86.     Plaintiffs file this action to seek relief from the State Bar discipline system by enjoining it, on First Amendment grounds, from ethically prosecuting Pavone in relation to the *Hyde* case.

87.     Multiple examples detailed herein have illustrated that the California State Bar discipline system refuses to respect the most basic facts, the most basic truths, and the most basic rules of law.

---

[22]    Exhibits 17-18.
[23]    Exhibit 19.
[24]    Exhibit 20.

PALADIN LAW, APC
402 W. BROADWAY, STE. 400
SAN DIEGO, CALIFORNIA 92101

88.     It therefore violates minimum federal due process requirements for a judicial system to be regarded as legitimate – including the expectation of common honesty – and this constitutes a federal due process violation.[25]

89.     Indeed, under California law, a legal system that cannot face the truth can be legally regarded as "worse than valueless"[26] or "reprehensible."[27]

90.     Initiating a pre-emptive action before counsel is charged by the discipline system in *Hyde* also inoculates counsel from the *Younger* bar.[28]

91.     Moreover, if and when counsel is charged by the State Bar for *Hyde*, and Pavone is inevitably found culpable of *something* – under its rules, any violation whatsoever – Pavone will be subject to another round of $27K fines.  This will cause him to have incurred about $80,000 in fabricated "costs," all for underlying cases in which Pavone was in the right, morally and legally, and was representing persons who were victims of physical, sexual, and financial misconduct.

92.     The discipline aspect of these cases involve the State Bar Court persistently refusing to face the truth: the truth that a lawyer who discloses the facts upon which he bases an opinion is insulated from a 6068(b) violation; and the truth that McClain's incompetence means the *Willis* case was an act of continuous elder abuse by Teresa's kidnappers and an unlawful assertion of authority by the courts, not ethical misconduct for the inherently expensive project of unraveling a complicated probate scam conducted across two states.

---

[25] *See, e.g., Rideau v. Louisiana* (1963) 373 U.S. 723, 726; *Brown v. Mississippi* (1963) 297 U.S. 278, 285-286; *San Bernardino v. Superior Court* (1991) 232 Cal.App.3d 188, 201-202; *Ciechon v. Chicago* (7th Cir. 1982) 686 F.2d 511, 522, *citing Wakinekona v. Olim* (9th Cir. 1981) 664 F.2d 708, 712.

[26] *Tatlow v. State Bar of California* (1936) 5 Cal.2d 520, 524; *In re Menna* (1995) 11 Cal.4th 975, 988-989.

[27] *See Carter v. State Bar* (1988) 44 Cal.3d 1091, 1100; *Rodgers v. State Bar* (1989) 48 Cal.3d 300, 315; *Inquiry Concerning Ross* (2005) 49 Cal.4th CJP Supp. 79, 89, *citing Kloepfer v. Commission on Judicial Performance* (1989) 49 Cal.3d 826, 865.

[28] *See Younger v. Harris* (1971) 401 U.S. 37, 49.

PALADIN LAW, APC
402 W. BROADWAY, STE. 400
SAN DIEGO, CALIFORNIA 92101

PALADIN LAW, APC
402 W. BROADWAY, STE. 400
SAN DIEGO, CALIFORNIA 92101

93.    The State Bar's pretense that $80,000 in fines are just "costs" is a massive lie, one that its attorneys promote and practice every day, by instituting these manufactured fines against virtually single attorney that is charged with a disciplinary offense.

94.    State Bar costs are actually quite nominal, since there are no filing fees, depositions are rarely permitted, and experts expenses are not recoverable under the applicable code section, B&P 6086.10.  The Bar's costs are typically a few hundred dollars to a few thousand.  For example, in the Martinez discipline case, the State Bar's actual costs were $195, for a reporter's transcript.

95.    The Bar's pretense of imposing tens of thousands of dollars as permissible "costs" is preposterous and represents a daily form of fraud committed by each and every OCTC professional involved in imposing this fraudulent revenue scam on California attorneys.[29]

## I.

### FIRST CLAIM FOR RELIEF

### VIOLATION OF 42 U.S.C. § 1983

### UNITED STATES CONSTITUTION - EIGHTH AMENDMENT

### EXCESSIVE FINES

### (REQUEST FOR DECLARATORY AND INJUNCTIVE RELIEF)

### (Against All Defendants)

96.    Plaintiffs incorporate the allegations of paragraphs 1-93, as if fully set forth herein.

97.    The Eighth Amendment to the U.S. Constitution provides: "Excessive bail shall not be required, nor excessive fines imposed… ."[30]

---

[29]  *See, e.g.,* Bus. & Prof. Code, § 6106.
[30]  U.S. Const., Amend. VIII.

PALADIN LAW, APC
402 W. BROADWAY, STE. 400
SAN DIEGO, CALIFORNIA 92101

98.    The Eighth Amendment applies to the States.[31]  This safeguard is fundamental to the American scheme of ordered liberty.[32]  The Excessive Fines Clause is therefore incorporated by the Due Process Clause of the Fourteenth Amendment.[33]

99.    Excessive fines have been used to retaliate against or chill the speech of political enemies.[34]  They have also been employed by government agencies (for example in the California State Bar discipline system), as a source of revenue.[35]

100.    A fine violates the Eighth Amendment if it is grossly disproportional to the gravity of a defendant's offense.[36]

101.    The fines imposed by the State Bar are clearly excessive, as itself admitted by State Bar leadership.  In September 2024, Leah Wilson, then State Bar president, issued a press release stating in relevant part, "[t]he outstanding work of the Ad Hoc Commission on the Discipline System revealed that discipline costs imposed by the State Bar not only outpaced those of any other attorney licensing agency nationwide, but also exceeded those of any other professional licensing entity in California.  I'm proud that our Board recently approved a revised cost structure, significantly reducing these fees moving forward."[37]

102.    Effectively, the State Bar president admitted a year ago that Bar fines were excessive, and yet, the current 2025 cost schedule has only increased them.[38]

103.    The State Bar cannot even bring itself to admit that these fines are "fines."  The Bar pretends these extraordinary impositions – typically $27,000 for the finding of any ethical violation at all that a targeted attorney appeals – are "costs."

[31]  *Timbs v. Indiana* (2019) 586 U.S. 146, 149-150.
[32]  *McDonald v. Chicago* (2010) 561 U.S. 742, 767.
[33]  *Timbs v. Indiana* (2019) 586 U.S. 146, 149-150.
[34]  *See Browning-Ferris v. Kelco* (1989) 492 U. S. 257, 267.
[35]  *See Timbs v. Indiana* (2019) 586 U.S. 146, 154, *citing Harmelin v. Michigan,* 501 U. S. 957, 979, n. 9.
[36]  *United States v. Bajakajian*, 524 U.S. 321, 327-28 (1998); *Anton v. United States*, 225 F.Supp.2d 770, 780 (E.D. Mich. 2002).
[37]  Exhibit 13.
[38]  Exhibit 13; Exhibit 1:17.

104.     This is simply a fraudulent statement.  The California legislature has announced appropriate fines in a discipline case, between a few hundred to a maximum of $50,000 for egregious misconduct, and are typically around $2,500 to $5,000.  The State Bar has no right to quintuple the applicable fines by fraudulently relabeling these significant financial impositions as "costs," when they are clearly not costs.  State Bar actual costs are relatively nominal, a few hundred to a few thousand dollars.

105.     In addition, discipline fines – masquerading as costs – are imposed based on an automated schedule.[39]  Courts may not automate legal findings.[40]  In 1994, a State Bar case illegally authorized the automated schedule as a proxy for its costs, but at the time, "costs" were only $3,309.

106.     That would be about $7,000 today, adjusted for inflation.  But the schedule today imposes over $25,000 for any case that was appealed – over three times more than it did in 1994, adjusted for inflation.

107.     Discipline fines (imposed as "costs") currently involve figures that exceed $21,000 for a two-day trial and over $26,000 for an appeal.[41]  This is an extraordinary amount of money to impose for ethics violations that are often objectively

---

[39]   Exhibit 1.

[40]   *Wolff v. McDonnell* (1974) 418 U.S. 539, 558 ["The touchstone of due process is *protection of the individual* against arbitrary action of government"]; *Demore v. Kim*  (2003) 538 U.S. 510, 551 [""Due process calls for *an individual determination*" before rights are taken away]; *People v. Peoples* (2016) 62 Cal.4th 718, 741, 747, 759, 768, 774 [repeatedly memorializing basic due process contention that defendant entitled to reliable *and individual determination* of his rights]; *United States v. Grant* (C.D. Cal. 2007) 524 F.Supp.2d 1204, 1214-1215 ["The right to substantive due process protects *individual* liberty against certain government actions regardless of the fairness of the procedures used to implement them"]; *People v. Hernandez* (1984) 160 Cal.App.3d 725, 747-748; Karst, Supreme Court (1977) "*1976 Term –Foreword: Equal Citizenship Under the Fourteenth Amendment*," 91 Harv. L. Rev. 1, 5-11 [there is an "important due process interest in recognizing the dignity and worth *of the individual* by treating him as an equal, fully participating and responsible member of society"]; *In re C.P.* (2020) 47 Cal.App.5th 17, 30, fn. 8.

[41]   Bus. & Prof. Code, § 6086.10; *see* Exhibit 1:17

PALADIN LAW, APC
402 W. BROADWAY, STE. 400
SAN DIEGO, CALIFORNIA 92101

minor, such as by a single offending sentence in a legal document or omitting to comply with a nonprejudicial rule in the State Bar's current 72-page single-spaced CPRC rulebook.

108.    Attorneys are rarely criminals committing Penal Code offenses, yet California criminal fines, after the commission of a violent felony, are typically a fraction of the current State Bar fines, $5,000-$10,000 in most cases.

109.    The State Bar's fine imposition system seems to be premised on the fiction that attorneys make lots of money and can afford these significant sums, but many solo and small-firm practitioners do not make much money, especially since many of these lawyers operate on the plaintiff-contingency business model, which is extraordinarily risky, and suffer adverse outcomes when defense-oriented judges decide that massive evidentiary proofs are "unsupported speculation."

110.    As relevant here, having been the continuous target of State Bar prosecutions for the last six years, undersigned counsel's once prosperous law practice has been financially decimated.

111.    The State Bar cost schedule is also diabolical in that it is progressive: the longer a discipline target resists his case, the higher the "costs" are.  This sends a message: the target must pay a massive price for resisting, which is contrary to accepted constitutional principles establishing that an attorney may exercise all of his legal rights without being penalized for such resistance.[42]

112.    On top of "cost" fines, the State Bar also imposes "regular" fines, adding even more money to the agency's pot of extractions taken from the target if it "wins" the case – winning being curiously defined as victory on even one charge – which are anywhere from $1,000 to $50,000 per case.[43]

---

[42]  *United States v. Goodwin* (1982) 457 U.S. 368, 372; *Bordenkircher v. Hayes* (1978) 434 U.S. 357, 363; *see* Bus. & Prof. Code, §§ 6085, 6085, subd. (e) ["Any person complained against shall … have a fair, adequate, and reasonable opportunity and right … to exercise any right guaranteed by the California Constitution or the United States Constitution, including the right against self-incrimination."]

[43]  SBRP, Rule 5.137(A); Bus. & Prof. Code, § 6086.13.

PALADIN LAW, APC
402 W. BROADWAY, STE. 400
SAN DIEGO, CALIFORNIA 92101

113.    Thus, in Plaintiff's first case, *Martinez*, the one in which the discipline system simply refused to address the dispositive First Amendment disclosure principle, the "fine fine" imposed was $2,500, on top of $24,700.50 in "cost" fines, for a total fine package of over $27,000.

114.    Incredibly, State Bar Rules prohibit any challenge to these fines.[44]  Such a rule violates one of the oldest and most venerable notions of due process in the history of this republic, the prerogative of judicial review, originally expressed in *Marbury v. Madison*.[45]

115.    The State Bar's continued enforcement of this rule, even after its obvious *Marbury* illegality was pointed out, is a singularly telling indicator of how laser-focused the discipline system is on protecting its contrived revenue stream, without any regard for fundamental constitutional principles.

116.    The discipline system exempts the politically powerful, because they possess the resources and political connections to disrupt the State Bar assembly line. The system only picks on the politically powerless (solo and small-firm attorneys) – because they cannot.

117.    In 2021, Plaintiff performed a 676-case study of OCTC's docket universe and concluded that 99.2% of discipline targets are solo and small-firm attorneys, legal professionals who can least afford these expensive and invented financial impositions.

---

[44]    SBRP, Rule 5.130(A).

[45]    *Hamilton v. Dudley* (1829) 27 U.S. 492, 526, 7 L. Ed. 496; *United States v. Enas* (9th Cir. 2001) 255 F.3d 662, 673; *Byers v. Board of Supervisors* (1968) 262 Cal.App.2d 148, 157 [courts have inherent authority to determine whether statutes enacted by the Legislature transcend the limits imposed by either federal or state Constitutions [citing *Marbury*.].  "This power of the courts to pass on the constitutionality of legislative enactments is not derived from any specific constitutional provision, but is a necessary consequence of our system of government.  It is the duty of courts to maintain supremacy of the Constitution."]; *People v. Ramirez* (1979) 25 Cal.3d 260, 267–268 ["For government to dispose of a person's significant interests without offering him a chance to be heard is to risk treating him as a nonperson, an object, rather than a respected participating citizen"]

**II.**

**SECOND CLAIM FOR RELIEF**

**VIOLATION OF 42 U.S.C. § 1983**

**UNITED STATES CONSTITUTION -
FIRST AMENDMENT**

**(REQUEST FOR DECLARATORY
AND INJUNCTIVE RELIEF)**

**(Against All Defendants)**

118.    Plaintiff hereby incorporates paragraph 1-115, as if fully set forth into this cause of action.

119.    The First Amendment to the United States Constitution, especially as interpreted in *Bridges*[46] and *Yagman*,[47] provides attorneys broad license to speak candidly, honestly, and even rudely, as long as their objective actions do not violate the California Rules of Professional Conduct.

120.    The ethical accusations leveled at Attorney Pavone in the *Hyde* matter include a series of implausible accusations, based on statements falling within his First Amendment rights.

121.    Plaintiffs provide a summary response to the five allegations currently waged against undersigned counsel, plus a sixth possible claim, not alleged in the Bar's investigatory letter, but that also occurred during the *Hyde* case.

**A.    One: Alleged "Harassment" of a Witness, Sandra Ledesma.**

122.    The McDermott/Bailey first complaint was phrased as:

> You represent plaintiff in *Hyde v. McDermott*, case no. 37-2021-00005732-CU-PO-CTL in San Diego Superior Court. You sent a series of harassing text messages to Sandra Ledesma, including one on November 12, 2021, which accused the witness of lying and perjury and implicitly threatened criminal prosecution (to gain an advantage in the civil

---

[46]    *Bridges v. California* (1941) 314 U.S. 252, 270-271.
[47]    *Yagman v. Standing Committee* (9th Cir. 1995) 55 F.3d 1430, 1438-1441.

PALADIN LAW, APC
402 W. BROADWAY, STE. 400
SAN DIEGO, CALIFORNIA 92101

litigation). You also contacted the witness directly on April 21, 2022, despite having reason to believe she was represented by counsel.[48]

123. The truth is that counsel's text messages constituted normal inquiries to a hostile witness. At the time of these exchanges, Ledesma was not represented. There was an indication that she would be represented in the future, but this obviously did not establish representation at the time the text messages were exchanged.

124. California Rules of Professional Conduct, Rule 3.10, states:

> A lawyer shall not threaten to present criminal, administrative, or disciplinary charges to obtain an advantage in a civil dispute.

125. Given the rule, there are multiple defects with the complaint. First, there was no language in these communications that "threaten to present" criminal charges. Pointing out to a witness that some act constitutes a crime is not such a threat and there is no "implied" version of the rule.

126. Moreover, it is exactly consistent with an attorney's ethical duties to implore a witness not to commit perjury ("You should think long and hard about lying under oath.") It is also not ethically controversial to accurately inform a witness that perjury is a felony; this is just another proper act of encouraging the witness not to commit it ("Perjury is a felony in the State of California").

127. Accordingly, all of counsel's statements to Ledesma were well-within counsel's First Amendment rights.

128. There was also nothing ethically improper about inquiries to determine whether Sandra Ledesma was represented. As she did not confirm that she was – because at the time she was not – these communications were also clearly protected by the First Amendment, as garden variety attorney communications.

---

[48] Exhibit 15.

**B.  <u>Two</u>: Metaphorical Reference to "Testicular Integrity" is Free Speech.**

129.    The second accusation by the McDermott/Bailey faction claims that "[o]n May 16, 2023, you stated to a male attorney via email, 'You might consider displaying the testicular integrity to make the request yourself – and not deflect the heat of the anticipated response to an unwitting female underling.' This language was offensive, unprofessional, and evidence of a biased and discriminatory attitude regarding sex and gender identities and roles."[49]

130.    At first blush one might harbor a vague concern that there is some sort of gender violation in play, only to end up, after a legal and historical analysis, with the conclusion that there is clearly no ethics violation and in fact that the person making the allegation does not know anything about gender, ethics, or the United States Constitution.

131.    As factual background, the sentence in question is the culmination of a series of observations about sharp tactics being utilized by an attorney named Tory Bishop, in an offshoot federal insurance case of the main *Hyde* matter.  Mr. Bishop had been avoiding compliance with Federal Rule of Civil Procedure, Rule 26, which pertains to discovery.

132.    After engaging in these sharp tactics, he then arranged for a female associate, Meghan Blinn, to make a request for Pavone to extend him the professional courtesy of an extension of time for a particular brief.  In denying the request, undersigned counsel made the above comment to him.

133.    According to Mr. McDermott's allegations (undoubtedly prepared by Attorney Bailey), "[t]his language was offensive, unprofessional, and evidence of a biased and discriminatory attitude regarding sex and gender identities and roles."[50]

134.    Let us start with the message's actual meaning.  Counsel was communicating that Mr. Bishop, as a man, and under the circumstances where he,

---

[49]  Exhibit 15:1.
[50]  Exhibit 15:1.

PALADIN LAW, APC
402 W. BROADWAY, STE. 400
SAN DIEGO, CALIFORNIA 92101

Biship, was in a difficult position of having to ask for a professional courtesy after not cooperating with discovery, might want to display the integrity and courage to make such a request personally, instead of pawning it off on a female associate.

135.   His decision to have Ms. Blinn make this difficult request, by seeking a professional courtesy that he, Bishop, did not deserve, struck undersigned counsel as an act of cowardice and not a very charitable obligation to foist on Ms. Blinn.

136.   In other words, Pavone's underlying message is one of chivalry: counsel was basically saying, 'Hey male attorney Bishop, it is not cool to make your female underlings do your dirty work.'

137.   There is nothing inherently discriminatory about this message on a gender basis.  Yes, it draws a distinction between the sexes, but so do many acts of chivalry. Opening a door for a female attorney could be viewed as a gender violation under this standard, or, giving up one's seat to a pregnant lawyer.

138.   Nor is asking for an opposing attorney to behave in a more chivalrous manner toward female subordinates any sort of ethics violation; it is a human courtesy. Consequently, there is no fundamental communication intended to discriminate within this communication and these remarks thus also clearly fall within counsel's First Amendment rights.

139.   Moreover, the idea of a statement being able to be ethically prosecuted because it is supposedly "offensive" (to *someone*) was long ago dismantled – due to its obvious subjectivity and easy resulting abuse – back in 1996, with the invalidation of Business & Professions Code section 6068(f).[51]

**C.   <u>Three</u>: Sanctions Should Never Have Been Imposed for Pavone's of a Motion for Reconsideration after a Plainly Inaccurate Ruling on an Anti-SLAPP Motion.**

140.   The next inquiry by the State Bar alleged as follows:

> On January 26, 2024, the court found that you had submitted a frivolous filing, a motion for

---

[51]   *United States v. Wunsch* (9th Cir. 1996) 84 F.3d 1110, 1118., 1119-1120.

PALADIN LAW, APC
402 W. BROADWAY, STE. 400
SAN DIEGO, CALIFORNIA 92101

reconsideration filed July 14, 2023, and imposed sanctions of $4,750 on you and your client. The motion repeated the same arguments already presented in your Anti-SLAAP [sic] motion and opposition to defendant's Anti-SLAAP [sic] motions, which the court had already rejected.[52]

141.   To understand this accusation, one must start with the original issue being litigated, before the motion for reconsideration was filed.  The original issue relates to the McDermott-Berger-Bailey abuse-of-women scheme addressed to the question of whether David Hyde committed acts of sexual battery against two women, Ledesma and Mesta.

142.   Simply, McDermott and Ledesma fabricated accusations that David Hyde committed sexual battery on Ledesma and Mesta.  It is unimaginable that Attorneys Berger and Bailey were not fully aware of this.  It was detected by undersigned, operating form the outside.  They were on the inside trying to hide it.

143.   They orchestrated an entire deposition in which Ledesma committed approximately 50 acts of perjury.  Attorney Berger represented Ledesma at her deposition and was giving her legal advice during it, perhaps instructing her on the best way to keep her perjurious story straight.  Attorney Bailey was the attorney for Sean McDermott, the business owner who convinced Ledesma to give this perjurious testimony in the first instance, in exchange for McDermott's agreement to pay Attorney Berger's legal fees – a bribe.[53]

144.   It is also impossible to believe that Judge Ronald Frazier was so incredibly dimwitted that he did not appreciate that Ledesma's deposition was perjured.  But even if one thought this – counsel does not – all this would mean legally is that he is

[52]   Exhibit 15:2.
[53]   This was a terrible deal for Ledesma and underscores the magnitude of abuse that McDermott, Berger, and Bailey committed on her, by having employment power over her.  It is hardly a good deal for an employer like McDermott to solicit an employee to commit 50 instances of felony perjury in exchange for the mere consideration that she will have the assistance of an attorney to help her do it.

PALADIN LAW, APC
402 W. BROADWAY, STE. 400
SAN DIEGO, CALIFORNIA 92101

incompetent as a judge, within the meaning of Canon Three of the Code of Judicial Conduct.

145.   Simply, there is no possible way anyone seriously believed that McDermott's abuse-of-women scheme did not qualify for an exception to the litigation privilege, under the malice exception, and yet – for reasons to be developed in discovery – Judge Frazier declared that this body of evidence was "unsupported speculation."

146.   To understand the judge's failure on this issue, before the motion for reconsideration, it requires some basic background about the rules governing judges. The first three canons of the California Code of Judicial Ethics state that a judge shall (1) "uphold the integrity and independence of the judiciary"; (2) "avoid impropriety and the appearance of impropriety;" and (3) "perform the duties of judicial office impartially, competently, and diligently."[54]  These obligations require a judge to maintain an open mind in considering the issues presented.[55]

147.   Canon 3B(8) of the Code of Judicial Ethics provides that: "A judge shall dispose of all judicial matters fairly, promptly, and efficiently.  A judge shall manage the courtroom in a manner that provides all litigants the opportunity to have their matters fairly adjudicated in accordance with the law."[56]

148.   It goes without saying that honesty is the most fundamental qualification to serve as a judge.[57]  Judges are expected to be able to deal with reality.[58]

149.   And yet, when Judge Frazier was asked to decide whether the body of evidence detailed in support of a finding that Ledesma perjured her deposition and thus falsely accused Hyde – containing, for example, Ledesma's deposition testimony, Mesta's deposition testimony, and various other standard items of evidence – he

---

[54]   *Nuño v. California State University* (2020) 47 Cal.App.5th 799, 810-812, *citing* Cal. Code Jud. Ethics, canons 1, 2, 3.)
[55]   *Ibid*.
[56]   Cal. Code Jud. Ethics, Canon 3B(8) [emphasis added].
[57]   *Kloepfer v. Commission on Judicial Performance* (1989) 49 Cal.3d 826, 865.
[58]   *Inquiry Concerning Platt* (2002) 48 Cal.4th CJP Supp. 227, 253.

PALADIN LAW, APC
402 W. BROADWAY, STE. 400
SAN DIEGO, CALIFORNIA 92101

incredibly ruled that Hyde's argument that Ledesma fabricated the accusation of sexual misconduct constituted "unsupported speculation."[59]

150.    He actually characterized an utterly uncontroversial deduction drawn from the perjured deposition testimony of Sandra Ledesma, the expose deposition of Tiana Mesta, Hyde's unimpeachable, sworn testimony, agent admissions by McDermott (through his attorneys), text message admissions by Ledesma, agent admissions by Ledesma through the writings of her attorney, inconsistent reporting between McDermott and Ledesma, a polygraph exam of David, the refusal of Ledesma to take a polygraph exam, and various other implausible positions taken by McDermott as "unsupported speculation."[60]

151.    This is the singularly implausible, counterfactual, and inaccurate ruling that defines the *Hyde* case.  This ruling is deeply problematic, in that it opens up the possibility of the San Diego implicit or unspoken "favor trade" that is so often seen in that city.  San Diego was already subject to accusations along these lines – lawyers bribing judges – in a federal action brought in the 1990's that resulted in multiple racketeering convictions.[61]

152.    Whether Judge Frazier's ruling is the product of a "favor trade" between him and Attorneys Berger, or Bailey, or Bailey's firm, or McDermott, or The Grove, or whether it is maybe retaliation for *Willis*, or some other dynamic by which Judge Frazier engaged in his disingenuous syllogistics by denying the truth, denying reality, violating the law, and violating his canonical competency obligations to rule accurately, there is no way on this earthly planet that that body of compelling evidence constituted "unsupported speculation."

153.    Furthermore, to fully appreciate the magnitude of harm that this ruling caused, above and beyond punishing David Hyde and undersigned counsel, Judge Frazier's ruling directly contributed and assisted the McDermott-Berger-Bailey program

---

[59]    Exhibit 5:4-5.
[60]    Exhibit 5:4-5.
[61]    *United States v. Frega* (9th Cir. 1999) 179 F.3d 793, 798.

PALADIN LAW, APC
402 W. BROADWAY, STE. 400
SAN DIEGO, CALIFORNIA 92101

of exploiting, abusing, and manipulating women, by enabling them to get away with their perjury-based crimes along these lines, instead of facing accountability for them at a trial.

154.   It was akin to a judge dismissing a murder case, so that his favored defense attorneys can avoid a revelation that they were involved in moving the body. Meanwhile, there is a dead victim for whom justice has been denied.

155.   Regardless, the finding that Hyde's list of evidence was unsupported speculation caused Frazier to eliminate eight causes of action for sexual harassment against McDermott and Ledesma, resulted in McDermott and Ledesma winning their anti-SLAPP motions, and eventually resulted in a judgment of over $40,000 in attorney's fees against David Hyde, as well as $23,000 in sanctions against undersigned counsel.

156.   So, Attorney Pavone's first response to the accusation in question is that a motion for reconsideration should never have been necessary and that counsel should not have faced the risk of sanctions, if even the most rudimentary respect for the truth had been honored by the San Diego judiciary.

**D.   Four: the Motion for Reconsideration Was Not Legally Frivolous, as Undersigned Counsel Was Permitted to Examine an Issue that Was First Raised in the Ruling Itself, the Issue of "Unsupported Speculation," and Examined it by Reference to New Evidence and New Authority.**

157.   Given that the issue of the evidence being "unsupported speculation" was first raised in the judge's ruling, after its circulation undersigned counsel sent 10 letters to the defense asking them to explain how each, or any, of the items in the 11-item list actually constituted "unsupported speculation."

158.   The defense did not respond to a single letter.  This is an admission by silence, a confession that the defense knew the evidence tendered was not speculation. Thus, the 10 letters support the idea that there was new evidence suggesting that the Court's conclusion was incorrect: the defense's utter inability to debate that the judge's "unsupported speculation" was accurate.

PALADIN LAW, APC
402 W. BROADWAY, STE. 400
SAN DIEGO, CALIFORNIA 92101

159. *Film Packages v. Brandywine* [62] settles the issue.. While it is true that a motion for reconsideration should ordinarily be supported by a "different state of facts,"[63] this is not required. In *Film Packages*, a creditor sought to obtain a right to attach order but failed to initially convince the trial court of the probable validity of its claim.[64] The plaintiff tried again by submitting deposition testimony that "shed new light on the case. Contrasted with the naked facts which showed up in previous declarations by the subsequent deponents, the depositions provided 'many subtle nuances and subjective impressions' none of which could be drawn from the declarations."[65] Thus, the Second District held that "while new facts, in the sense of substantive occurrences which were not previously known, were not shown, *new evidence of the meaning of those facts* was produced."[66]

160. There is no material distinction from *Brandywine* to the case here. As a preliminary matter, undersigned could not have produced evidence about the topic of the 11-item's list supposedly speculative nature within the original motion, as the Court first characterized the list as unsupported speculation in its written ruling.

161. More importantly, the question of whether the list was speculative was informed by the fact that the defense could not remotely justify that any aspect of the list qualified as such, as when directly confronted with 10 letters speaking to every item on the list, defaulted.

162. Moreover, the motion or reconsideration was not based on debating the earlier disputes: the earlier debate was about whether Hyde's causes of action were (impermissibly) based on Sean's false sexual misconduct accusations to police (they were not) and debating whether alleged reporting of sexual misconduct is simply immune from any possible liability at all, even if the reporting is false. It is not:

---

[62] *Film Packages v. Brandywine* (1987) 193 Cal.App.3d 824, 829.
[63] *Blue Mountain v. Carville* (1982) 132 Cal.App.3d 1005, 1013.
[64] *Brandywine*, at 826.
[65] *Brandywine*, at 829.
[66] *Brandywine*, at 829 [italics added].

PALADIN LAW, APC
402 W. BROADWAY, STE. 400
SAN DIEGO, CALIFORNIA 92101

"malicious" reporting constitutes an exception to immunity, pursuant to Civil Code section 47(c).

163. In contrast, the motion for reconsideration was addressed to the question of what constitutes speculation and whether the trial court's reasoning for characterizing it as such made any sense.

164. Thus, two very different legal debates were had from the first motion to the second and, under CCP 1008, this disparity sufficiently qualified to remove any risk that the motion was a frivolous regurgitation of the same dispute that was originally litigated.

165. If nothing else, there is a good faith argument – meaning that a party enjoys the legal right to make arguments that are warranted by existing law or a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law[67] – that when a trial court rules on a factual or legal basis not debated by the parties in the original briefing, it is not improper to litigate a motion for reconsideration addressing the unanticipated basis for ruling.

166. Thus, when undersigned cited a body of case law speaking to the meaning of the term "speculation" in the motion for reconsideration, this was by definition "different law" from the law debated in the earlier motion, which was about the rules of anti-SLAPP immunity.

167. Given this record, a finding that the motion was frivolous cannot meet the clear-and-convincing standard applicable to State Bar ethics violations and the entire motion exercise therefore falls within counsel's First Amendment right to petition the government.

### E.  Five: Counsel Paid the Sanctions.

168. The State Bar's fifth issue was phrased as:

> On March 1, 2024, the court issued sanctions against you in the amount of $2,275 to be paid to Ms. Ledesma by April 1, 2024. You failed to timely pay and report the sanction.

---

[67]  Code Civ. Proc., § 128.5(f)(2)(A).

PALADIN LAW, APC
402 W. BROADWAY, STE. 400
SAN DIEGO, CALIFORNIA 92101

169.   The sanctions were timely paid and timely reported to the Bar, on March 28, 2024.

170.   In summary, Plaintiff seeks protection from the State Bar's wildly inappropriate appetite for charging counsel with ethical offenses – will they attempt to charge 3,000 offenses in relation to *Hyde*? – if this Court does not intervene to stop this prosecutorial madness.

    **F.**  <u>**Six**</u>**: The San Diego Court's Subsequent $17K Sanction Fine Reflects a Grotesque Abuse of Power.  Counsel Filed a Perfectly Legitimate, Accurate, Amply Supported, Middle-of-the-Road Motion to Cite Attorney Bailey for Ethical Misconduct under CPRC 4.1 and 8.4.**

171.   Although this complaint is not mentioned by the State Bar in its investigatory letter of June 2025, Plaintiff seeks protection from ethical prosecution when the San Diego court, in *Hyde*, sanctioned him nearly $17,000 on September 25, 2024 for filing, of all things, an ethics motion.[68]

172.   Seven months earlier, on February 8, 2024, Plaintiff had filed a motion to cite Attorney Bailey for ethical misconduct for issuing a fraudulent demand for attorney's fees, in the amount of $13,565.

173.   Bailey had no grounds to assert such a claim.  He created this figure by proposing to charge Hyde more in attorney's fees for an earlier sanction motion that was already concluded.  He had already billed his time during that motion.

174.   When confronted to produce his billing records to support such a claim, Bailey refused.  To this day, Bailey refuses to produce his billing records, because they will reveal that his claim is fraudulent.

175.   There was no basis to sanction counsel for filing an ethics motion, based on California Rules of Court 4.1 and 8.4(c) (requiring honesty in an attorney's dealings), against Bailey.  The trial court's reasoning consists of a bunch of boilerplate legal buzzwords, in refusing to face the truth – once again, a court in San Diego brazenly skipping over the truth, as if it is some sort of condiment that it need not taste – that

---

[68]   Exhibit 14.

PALADIN LAW, APC
402 W. BROADWAY, STE. 400
SAN DIEGO, CALIFORNIA 92101

counsel's claim against Bailey was a perfectly legitimate, garden-variety, legally-uncontroversial motion.[69]

176.   Accordingly, counsel's ethics motion against Bailey falls within counsel's First Amendment right to petition the government and cannot be the subject of ethical prosecution.

## PRAYER FOR RELIEF

*Wherefore*, Plaintiffs seek the following relief:

(i)   a declaration that the California State Bar "cost" system is fraudulent and imposes excessive fines in violation of the Eighth Amendment on discipline targets;

(ii)   subordinate declaratory findings that:

   (a)   allegations of intellectual dishonesty cannot be prosecuted consistent with *Yagman* and attorneys must have the ability to allege intellectual dishonesty, the same as the judges who accuse attorneys of being disingenuous, in order to hold the judiciary to the high legal standards set by California law, in light of compelling evidence in this case that the judiciary refuses to face the truth, across multiple examples;

   (b)   Teresa McClain was never competent to make any serious decision, including to litigate;

(iii)   restitution to all disciplinary targets that have been forced to pay excessive fines;

(iv)   to enjoin the State Bar from imposing another round of excessive fines on Plaintiff Pavone, in the *Hyde* matter, and to generally prevent it from enforcing its current fine structure, because these fraudulent "costs" are, in fact, excessive fines under the Eighth Amendment for multiple reasons;[70]

(v)   to enjoin the State Bar from prosecuting Pavone for alleged wrongs that are simply are not ethical violations in the *Hyde* case, given his First Amendment rights of free speech and right to petition the government;

(vi)   attorney's fees, as available by law;

(vii)   costs;

---

[69]   Exhibit 16.
[70]   Exhibits 10, 12.

PALADIN LAW, APC
402 W. BROADWAY, STE. 400
SAN DIEGO, CALIFORNIA 92101

(viii)  such other and further relief as the Court deems appropriate;

Date: December 7, 2025                    PALADIN LAW, APC

_____
Benjamin Pavone, Esq.
Attorneys for Plaintiffs


## **<u>REQUEST FOR TRIAL BY JURY</u>**

Plaintiff respectfully requests trial by jury.


Date: December 7, 2025                    PALADIN LAW, APC

_____
Benjamin Pavone, Esq.
Attorneys for Plaintiffs